George C. Harris (CA SBN 111074)
GHarris@nortonlaw.com
THE NORTON LAW FIRM PC
299 Third Street, Suite 106
Oakland, California 94607
Telephone: (510) 906-4900

Attorney for Defendant
EFREN CONTRERAS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

EFREN CONTRERAS,

Defendant.

Case No. CR 19-0054-06 RS

**DEFENDANT EFREN CONTRERAS'S SENTENCING MEMORANDUM**

Location: Videoconference
Date: March 17, 2021
Time: 11:00 a.m.

Before the Honorable Richard Seeborg
United States District Judge

## TABLE OF CONTENTS

I. INTRODUCTION .......... 1

II. OFFENSE CONDUCT .......... 1

A. The January 9, 2019 Transaction (Count Seven) .......... 2

B. Mr. Contreras's Role in the Conspiracy (Count One) .......... 3

III. GUIDELINES CALCULATION .......... 3

IV. § 3553(A) FACTORS SUPPPORT A DOWNWARD VARIANCE TO A SENTENCE OF TIME SERVED AND THREE YEARS SUPERVISED RELEASE WITH 12 MONTHS LOCATION MONITORING, AS RECOMMENDED BY THE PROBATION OFFICE. .......... 4

A. Personal History and Characteristics .......... 5

B. Medical Needs .......... 6

C. Need to Provide for His Family .......... 9

D. Nature of the Offense. .......... 10

V. CONCLUSION .......... 11

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Gall v. United States*,
552 U.S. 38 (2007) .......... 5, 10

*Kimbrough v. United States*,
552 U.S. 85 (2007) .......... 5

*Koon v. United States*,
518 U.S. 81 (1996) .......... 5

*Pepper v. United States*,
562 U.S. 476 (2011) .......... 5

*United States v. Ball*,
No. 2:15-CR-00419-CAS, 2020 WL 4539023 (C.D. Cal. Aug. 5, 2020) .......... 9

*United States v. Burrill*,
No. 17-CR-00491-RS-1, 2020 WL 1846788 (N.D. Cal. Apr. 10, 2020) .......... 8

*United States v. Cabrera*,
567 F. Supp. 2d 271 (D. Mass. 2008) .......... 11

*United States v. Carty*,
520 F.3d 984 (9th Cir. 2008) .......... 5

*United States v. Conkins*,
9 F.3d 1377 (9th Cir. 1993) .......... 5

*United States v. Diaz,*
No. 11-00821-(JG), 2013 WL 322243 (E.D.N.Y. Jan. 28, 2013) .......... 11

*United States v. Goodman*,
556 F. Supp. 2d 1002 (D. Neb. 2008) .......... 11

*United States v. Head*,
2020 WL 3180149 (E.D. Cal. 2020) .......... 10

*United States v. Jebara*,
313 F. Supp. 2d 912 (E.D. Wis. 2004) .......... 10

*United States v. Lehmann*,
513 F.3d 805 (8th Cir. 2008) .......... 10

*United States v. Leon*,
341 F.3d 928 (9th Cir. 2003) .......... 10

*United States v. Mendoza*,
121 F.3d 510 (9th Cir. 1997) .......... 5

*United States v. Muñoz-Nava*,
524 F.3d 1137 (10th Cir. 2008) .......... 10

*United States v. Navarro*,
979 F.2d 786 (9th Cir. 1992) .......... 4

*United States v. Parker*,
461 F. Supp. 3d 966 (C.D. Cal. 2020) .......... 9

*United States v. Pena*,
459 F.Supp.3d 544, (S.D.N.Y. 2020) .......... 9

*United States v. Resnick*,
451 F. Supp. 3d 262 (S.D.N.Y. 2020) .......... 9, 10

*United States v. Rodriguez*,
451 F.Supp.3d 392, (E.D. Pa. 2020) .......... 9

*United States v. Schroeder*,
536 F.3d 746 (7th Cir. 2008) .......... 10

*United States v. Spedden*,
917 F. Supp. 404 (E.D. Va. 1996) .......... 10

**Statutes**

18 U.S.C. § 2 .......... 1

18 U.S.C. § 3553(a) .......... 5, 6, 7, 10

21 U.S.C. § 846 .......... 1

21 U.S.C. §§ 841(a)(1) .......... 1

**Rules**

U.S.S.G. § 1B1.3 .......... 5

U.S.S.G. § 2D1.1(c)(7) .......... 4

## I. INTRODUCTION

Efren Contreras is a 60-year-old native of Mexico, who came to this country nearly 40 years ago to join the rest of his family. He has worked hard to make a life for himself here and to support his two sons, who were born in this country. He made a very serious mistake by becoming involved in drug trafficking and committed serious crimes for which he accepts complete responsibility. His offense conduct was relatively limited, however, and there are significant other factors that the Court should consider, including Mr. Contreras's medical history and needs in the context of the continuing COVID-19 pandemic, his need to provide for his two sons, and his immigration status. Taking all relevant factors into account, a sentence of time-served with three-years supervised release, including 12-months' location monitoring, as recommended by the probation office, would be appropriate and sufficient to meet the statutory goals of sentencing. A custodial sentence, which would almost certainly be followed by deportation, would be greater than necessary.

## II. OFFENSE CONDUCT

In the original indictment in this case, filed on January 31, 2019, Mr. Contreras was charged with one count of distributing a quantity of methamphetamine and aiding and abetting, 21 U.S.C. §§ 841(a)(1), 18 U.S.C. § 2, based on a January 9, 2019 methamphetamine transaction. *See* Dkt. 1, Count Seven. That indictment consisted of seven counts and included conspiracy charges against other defendants. *Id*. A superseding indictment filed on June 30, 2020 added Mr. Contreras to a charge of conspiracy to distribute and possess with intent to distribute a quantity of methamphetamine, 21 U.S.C. § 846. *See* Dkt. 172, Count One.

On November 4, 2020, Mr. Contreras pled guilty to both charges against him in the superseding indictment. As reflected in his plea agreement, his responses to questions by the probation officer, and his successfully completed safety valve interview, Mr. Contreras accepts complete responsibility for his illegal conduct. *See* Dkt. 227 ("PSR") ¶ 47.

**A. The January 9, 2019 Transaction (Count Seven)**

The January 9, 2019 methamphetamine transaction that is the basis for Count Seven in the original and superseding indictments was arranged between Mr. Contreras and a person now known to be a confidential government informant (the "CI"). Mr. Contreras had met the CI a number of years ago when Mr. Contreras operated a body shop in South San Francisco. The CI brought a car to the shop that had been in an accident and needed repair. Thereafter, the CI would sometimes come to the body shop to socialize with one of Mr. Contreras's co-workers.

Mr. Contreras began working at E&E Enterprise Auto Body Shop in San Bruno in late 2017. After Mr. Contreras had been working at E&E for some time, the CI came to E&E with a car that needed repair. Later, when Mr. Contreras ran in to the CI in San Bruno, the CI asked Mr. Contreras if he could help him find someone from whom he could purchase drugs. Mr. Contreras told the CI he would try to help him and gave the CI his phone number.

After that meeting, the CI called Mr. Contreras repeatedly. When Mr. Contreras did not pick up the CI's calls, the CI came to E&E with the same request and berated Mr. Contreras for not answering his calls. In late December 2018, the CI appeared at E&E and again pressed Mr. Contreras to help him find a contact for drug purchase. Around January 5 or 6, 2019, the CI appeared at the shop again. Mr. Contreras told the CI that he would find someone who could sell the CI methamphetamine. The CI told him he wanted one ounce.

Mr. Contreras then approached a co-worker whom he knew used drugs. The co-worker told him that he had a friend in San Jose who could get one ounce of methamphetamine and that it would cost $400. Mr. Contreras arranged with the CI to make the transaction on January 9, 2019.

When the CI and an undercover law enforcement agent arrived at E&E on the evening of January 9, 2019, Mr. Contreras was not there. He had gone to the hospital for treatment of acute high blood pressure. When the CI phoned and texted Mr. Contreras, he did not answer. Mr. Contreras had given his co-worker the CI's phone number. The co-worker called the CI and told him that he was coming to E&E. The co-worker then came to E&E and exchanged

the ounce of methamphetamine for $400. Mr. Contreras received $100 from the co-worker for Mr. Contreras's part in arranging the transaction.

### B. Mr. Contreras's Role in the Conspiracy (Count One)

Mr. Contreras conspired with co-defendant Emanuel Rivera to distribute methamphetamine by attempting to identify customers for Rivera. In June 2018, Mr. Contreras successfully connected Rivera to a man that Mr. Contreras knew by the nickname "Llaves." Rivera negotiated a sale of one kilogram of methamphetamine for $6,700. For his part in facilitating the transaction, Mr. Contreras received $600.

## III. GUIDELINES CALCULATION

Mr. Contreras agrees with the probation office that the adjusted offense level is 21 (*see* PSR ¶¶ 48-66), calculated as follows:

| | U.S.S.G. Section | Level/Points |
|---|---|---|
| Base offense level | 2D1.1(c)(7) | 26 |
| Specific offense characteristics | | n/a |
| Acceptance of responsibility | 3E1.1 | -3 |
| Safety Valve | 2D1.1(b)(17) | -2 |
| Total offense level | | 21 |
| Criminal History Category | | I |
| RANGE | 37-46 months | |

The base offense level for the conviction counts should be based on the January 9, 2019, one-ounce (28-gram) methamphetamine transaction negotiated by Mr. Contreras with the CI. According to the government, it was pure methamphetamine, resulting in a base offense level of 26. *See* USSG § 2D1.1(c)(7) ("at least 20 G but less than 35 G of Methamphetamine (actual)").

The base offense level should not be based on the June 2019 one-kilogram transaction because the amount of that transaction was negotiated and controlled by co-defendant Rivera not Mr. Contreras, who provided the connection with the buyer but did not negotiate the

transaction. *See United States v. Navarro*, 979 F.2d 786, 788 (9th Cir. 1992) (under U.S.S.G. § 1B1.3, a defendant guilty of conspiracy to distribute narcotics "is not necessarily culpable for all the drugs attributable to the conspiracy;" finding record did not support consideration of all drug sales attributable to a broader conspiracy in sentencing individual); *United States v. Conkins*, 9 F.3d 1377, 1386-87 (9th Cir. 1993) ("[T]he sentencing court may only sentence a defendant for relevant conduct within the scope of the defendant's agreement that was reasonably foreseeable in connection with the criminal activity the defendant agreed to undertake jointly."); *cf. United States v. Mendoza*, 121 F.3d 510, 513- 514 (9th Cir. 1997) (holding district courts may "consider a downward departure on the ground that [defendant] had no control over, or knowledge of, the purity of the methamphetamine that he delivered" such that "the offense level grossly overstates the culpability of the defendant's conduct").

As noted by the PSR, Mr. Contreras is entitled to a two-level reduction for successful completion of a safety valve interview (Dkt. 227 ¶ 51) and a three-level reduction for acceptance of responsibility (*id*. ¶¶ 58-59). Mr. Contreras has a criminal history score of zero (*id* ¶ 63).

## IV. § 3553(a) FACTORS SUPPPORT A DOWNWARD VARIANCE TO A SENTENCE OF TIME SERVED AND THREE YEARS SUPERVISED RELEASE WITH 12 MONTHS LOCATION MONITORING, AS RECOMMENDED BY THE PROBATION OFFICE.

The "overarching provision" of 18 U.S.C. § 3553(a) is to impose a sentence that is sufficient but not greater than necessary to achieve the goals of sentencing. See *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). The Sentencing Guidelines are only one of several factors courts should weigh when "mak[ing] an individualized assessment" as to what constitutes a proper and just sentence. *Gall v. United States*, 552 U.S. 38, 50 (2007). As the Supreme Court has recognized, it is vital that the sentencing judge "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). A sentencing court should aim to fashion a sentence that fits "the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88

(2011) (citation omitted); see also *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) ("The district court may not presume that the Guidelines range is reasonable. Nor should the Guidelines factor be given more or less weight than any other.") (internal citations omitted).

Section 3553(a) provides that, in determining a sufficient sentence, district courts should consider a number of factors, including "the history and characteristics of the defendant"; "the nature and circumstances of the offense"; "the sentencing range established" by the Sentencing Guidelines; "any pertinent policy statement" issued by the Sentencing Commission pursuant to its statutory authority; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a).

Here, as noted by the PSR, there are substantial mitigating factors that are not accounted for in the computation of the advisory Guidelines range. PSR ¶ 115. A downward variance to a sentence of time served and three-years supervised release with 12 months location monitoring, as recommended by the PSR, would be sufficient to meet the statutory goals of sentencing. PSR, Sentencing Recommendation at 1-3. An advisory Guidelines sentence would be greater than necessary.

**A. Personal History and Characteristics**

Mr. Contreras had a difficult childhood in Mexico. He was separated from his mother, who came to the United State to work, and then from his grandmother, his primary caretaker, when she passed away. At around 8 years of age and in the third grade, Mr. Contreras dropped out of school due to anxiety, which manifested as panic attacks that made it difficult for him to stay in the classroom.

Mr. Contreras came to the United States in 1982 at the age of 21 or 22, joining the rest of his family, including his mother. He has never returned and has no continuing ties to Mexico.

Mr. Contreras has always worked hard to provide a living for himself and his family. He worked in house construction in Mexico as a young person. After arriving in the United

States, he lived in the Fresno area initially and was employed as an agricultural worker. Since moving to the San Francisco area to be closer to his family, he has worked primarily in auto repair shops and has gained expertise in auto body repair. After he was laid off from his auto body repair job due to the COVID-19 pandemic in September 2020, he found temporary work at a candy shop and then helping an independent contractor with home repairs before recently securing a job doing auto body repairs again.

Mr. Contreras met the mother of his children, Aurelia Chilaca, about 25 years ago after moving to the San Francisco area. They have two sons: Cesar, who is 21, and Brad, who is 14. Though Aurelia and Efren never married, they were together for about 13 years. They continue to have a friendly relationship and to cooperate in raising Cesar and Brad. Mr. Contreras is very devoted to his sons and spends time with them regularly. He has provided $500 per month for their support except when he was out of work. While out of work, he continued to provide about $250/month by depleting what savings he had.

Mr. Contreras's greatest fear is deportation and resulting separation from his family as a result of his convictions in this case. According to immigration and government counsel, this will almost certainly occur if he serves a custodial sentence but is significantly less certain if he does not go into custody. Immigration counsel advises that, absent conviction in this case, Mr. Contreras would have a path to legal residence and citizenship because his sons are U.S. citizens.

**B. Medical Needs**

Among the 33353(a) factors that should be considered is "the need for the sentence imposed to provide the defendant with needed . . . medical care . . . in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). Mr. Contreras is 60 years old and has significant needs for medical care. He suffers from hypertension and panic attacks. He has sought clinic and hospital care and takes prescribed medications to address those conditions.

The significance of these medical issues is severely heightened by the continuing risks resulting from the COVID-19 pandemic. The Centers for Disease Control and Prevention (the "CDC") has identified hypertension as the single most common comorbidity in COVID-

19-related hospitalizations, affecting 58.4% of adults hospitalized in 2020.[1] For someone with Mr. Contreras's pre-existing hypertension, exposure to the COVID virus could be life threatening.

The CDC has warned that prison settings are particularly susceptible to rapid COVID-19 transmission. Inmates come from a variety of geographic locations and live in congregate environments, without the option to leave the facility.[2] They are also limited in their ability to seek medical isolation options or exercise disease prevention measures, such as frequent handwashing or use of alcohol-based disinfectants.[3] The CDC's "dire predictions have [been] borne out in correctional institutions around the country." *United States v. Burrill*, No. 17-CR-00491-RS-1, 2020 WL 1846788, at *2 (N.D. Cal. Apr. 10, 2020) (citing articles reporting on COVID-19 mass outbreaks in correctional facilities).

The BOP reports that there are currently 852 federal inmates and 1,617 BOP staff who have confirmed positive test results for COVID-19, 46,926 inmates and 4,909 staff who have recovered, and 225 inmates and four BOP staff members who have died due to COVID-19.[4] Of the 225 inmate deaths, only four occurred while in home confinement.[5] Testing is limited, and it was reported at one point that over 70% of the BOP's system-wide COVID-19 tests of inmates, or 2,000 out of 2,700 tests, had come back positive.[6] BOP has not responded adequately to this crisis; despite thousands of sick federal prisoners, nearly all

---

[1] CDC, COVID-19 Page, *A Weekly Summary of U.S. COVID-19 Hospitalization Data*, https://gis.cdc.gov/grasp/COVIDNet/COVID19_5.html#medicalConditionsColumnDiv (visited March 6, 2021)

[2] CDC, COVID-19 Page, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (March 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidancecorrectional-detention.html (visited June 4, 2020).

[3] *Id.*

[4] BOP, *COVID-19 Coronavirus*, available at: https://www.bop.gov/coronavirus/ (visited March 6, 2021).

[5] *Id.*

[6] "Over 70% of Tested Inmates in Federal Prisons Have COVID-19, Official Figures Show," *Time* (April 30, 2020), available at: https://time.com/5829722/covid19-federal-prisonstesting.

compassionate release requests have been denied.[7]

Courts across the country have recognized that the COVID-19 pandemic presents "extraordinary and compelling" circumstances justifying the release of individuals suffering from medical conditions similar to those faced by Mr. Contreras. See, e.g., *United States v. Ball*, No. 2:15-CR-00419-CAS, 2020 WL 4539023, at *2 (C.D. Cal. Aug. 5, 2020) (finding defendant's age and medical conditions, including hypertension, "present extraordinary and compelling reasons that warrant a reduction in [defendant's] sentence"); *United States v. Parker*, 461 F. Supp. 3d 966, 980 (C.D. Cal. 2020) ("Since the onset of the COVID-19 pandemic, courts have determined that inmates suffering from conditions such as hypertension and diabetes are now at an even greater risk of deteriorating health, presenting 'extraordinary and compelling' circumstances that may justify compassionate release."); *United States v. Rodriguez*, 451 F.Supp.3d 392, 394, (E.D. Pa. 2020) (granting compassionate release and noting that for an inmate suffering from diabetes and high blood pressure, "nothing could be more extraordinary and compelling than this pandemic."); *United States v. Pena*, 459 F.Supp.3d 544, 550, (S.D.N.Y. 2020) ("This Court has repeatedly recognized that COVID-19 presents a heightened risk for individuals with hypertension[.]"); *United States v. Resnick*, 451 F. Supp. 3d 262, 269–70 (S.D.N.Y. 2020) ("Given (1) the highly infectious nature of COVID-19, (2) the limitations in a prison environment (even a prison medical center) on practicing the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and (3) the fact that Mr. Resnick suffers from ailments that have already been identified as 'high risk,' this Court finds that Mr. Resnick's legitimate medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release.")

Courts have also noted that inmates with risk factors may be unable to take even basic health precautions while incarcerated due to the current conditions at federal facilities.

---

[7] *See, e.g.,* "Thousands of sick federal prisoners sought release as Covid-19 spread. Nearly all were denied," *NBC News* (Oct. 7, 2020), available at: https://www.nbcnews.com/news/us-news/thousands-sick-federal-prisoners-sought-release-covid-19-spread-nearly-n1242193.

*United States v. Head*, 2020 WL 3180149 at *5-7 (E.D. Cal. 2020). (granting compassionate release where "the record before the court demonstrates defendant cannot comply with the CDC's recommendations while incarcerated at USP Lompoc."); *Resnick*, 451 F. Supp. at 269–70 (noting the "limitations in a prison environment," including medical facilities, on the ability to follow CDC guidelines to reduce the risk of COVID-19 transmission).

Given his medical conditions and the state of COVID-19 in correctional facilities, Mr. Contreras could face life-threatening risks serving a custodial sentence. Just as courts across the country have recognized the significance of this risk in evaluating requests for compassionate release, these exceptional circumstances warrant close consideration under § 3553(a)(2)(D).

### C. Need to Provide for His Family

Mr. Contreras's family circumstances and responsibilities also support a downward variance and a non-custodial sentence with location monitoring. See *Gall v. United States*, 552 U.S. 38, 59 (2007) ("compelling family circumstances" can make probation an appropriate sentence). This would allow Mr. Contreras to continue to provide vital support for his two sons. See, e.g., *United States v. Muñoz-Nava*, 524 F.3d 1137, 1142-43 (10th Cir. 2008) (upholding downward variance where defendant cared for his eight-year-old son as a single parent and had elderly parents with serious medical problems); *United States v. Leon*, 341 F.3d 928, 932-33 (9th Cir. 2003) (upholding downward variance and sentence split between imprisonment and home confinement based on poor emotional and physical health of defendant's ailing wife and his role as the person who took care of her); *United States v. Lehmann*, 513 F.3d 805, 806-07 (8th Cir. 2008) (affirming downward variance to probation where the district court found that a prison sentence would negatively affect the defendant's disabled young son); *United States v. Schroeder*, 536 F.3d 746, 750-51 (7th Cir. 2008) (remanding for resentencing where the sentencing court did not address extraordinary family circumstances); *United States v. Jebara*, 313 F. Supp. 2d 912, 913-14 (E.D. Wis. 2004) (downward variance where defendant's children and grandchildren depended on her for fundamental needs like cooking, cleaning, and shopping); *United States v. Spedden*, 917 F.

Supp. 404, 409 (E.D. Va. 1996) (home confinement sentence due to cumulative nature of medical hardships facing defendant's family).

Mr. Contreras's family, particularly his two young sons and their mother, rely on his support. Mr. Contreras's mother also has substantial medical disabilities. In addition, a custodial sentence would almost certainly result in deportation, separating Mr. Contreras from his family and depriving them permanently of his support.

**D. Nature of the Offense.**

The appropriate sentence here should not be controlled by the advisory Guidelines range, which is driven by the drug quantity table. A number of courts have criticized the weight-driven sentencing scheme because drug type and quantity are "poor prox[ies] for culpability," and the scheme is not based on empirical data or national experience. *United States v. Diaz,* No. 11-00821-(JG), 2013 WL 322243, at *1, *13 (E.D.N.Y. Jan. 28, 2013). The legislative intent behind the scheme "was to specifically target and punish managers and leaders of drug enterprises," yet the "overwhelming majority of drug trafficking offenders are neither managers or leaders." *Id*. at *6; *see also United States v. Cabrera*, 567 F. Supp. 2d 271, 275 (D. Mass. 2008) (varying downward and rejecting the cocaine guideline on the basis of "the over-emphasis on quantity and the under-emphasis on role in the offense"); *United States v. Goodman*, 556 F. Supp. 2d 1002, 1016 (D. Neb. 2008) (varying downward in a conspiracy to manufacture methamphetamine case and holding that "[a] variance is appropriate in view of the fact that the Guidelines at issue were developed pursuant to statutory directive and not based on empirical evidence"). The United States Sentencing Commission has acknowledged the validity of this criticism.[8]

[8] *See* Statement of the Hon. Patti B. Saris, Chair, U.S. Sentencing Comm'n, for the Hearing on "Reevaluating the Effectiveness of Federal Mandatory Minimum Sentences" before the U.S. Senate Committee on the Judiciary, at 5 (Sept. 18, 2013), http://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/submissions/20130918_SJC_Mandatory_Minimums.pdf (last visited March 6, 2021) ("[T]he Commission's research has found that the [drug] quantity involved in an offense is often not as good a proxy for the function played by the offender as Congress may have believed.").

Here, Mr. Contreras has committed serious crimes for which he accepts complete responsibility. But his conduct was limited to connecting drug purchasers and sellers on two occasions for which he received a total of $700.

## V. CONCLUSION

Mr. Contreras is a hard-working immigrant, who is devoted to his family and the support of his two young sons. He has had a difficult life and suffers from hypertension and panic attacks. He made a very serious mistake by becoming involved in drug trafficking. A time-served sentence with three year's supervised release, including 12-months' location monitoring, as recommended by the probation office, would recognize the seriousness of the offense while allowing him to continue to get proper medical treatment, support his family, and have a chance of avoiding deportation, which would permanently separate him from his family and send him at 60 years of age to a country that he left nearly 40 years ago and where he has no family or other support.

Dated: March 10, 2021

Respectfully submitted,

THE NORTON LAW FIRM PC

*/s/ George C. Harris*

By: George C. Harris
Attorneys for Defendant
EFREN CONTRERAS